TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
KATHY YU (Cal. Bar No. 268210)
KEVIN B. REIDY (Cal. Bar No. 320583)
Assistant United States Attorneys
      1200/1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2431/8536
      Facsimile: (213) 894-3713
      E-mail:    kathy.yu@usdoj.gov
                 kevin.reidy@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL NAVARRO,<br>  aka "dn.2021.01,"<br>  aka "dn84831,"<br><br>Defendant. | No. CR 22-00340(B)-AB<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT DANIEL NAVARRO<br><br>[Exhibits Filed Concurrently Under Seal]<br><br>Sentencing Hearing:  May 13, 2026 |

     Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Kathy Yu and Kevin B. Reidy, hereby files its Sentencing Position for Defendant Daniel Navarro.

     The government's sentencing position is based upon the attached memorandum of points and authorities, the concurrently filed exhibits (under seal), the files and records in this case, the

1

Presentence Investigation Report, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

Dated: April 29, 2026       Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division


 /s/
_____
KATHY YU
KEVIN B. REIDY
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Victims A.T. and J.G. – two 14-year-old girls – believed that defendant Daniel Navarro ("defendant") was offering them a lifeline: an escape from their troubled lives, the unconditional love they so desperately sought, and the security they never had.  Defendant met A.T. and J.G. via Instagram, where he posed as "Danny," a 15-year-old football player from California who told them he would not abandon them or judge them for any past traumas they had suffered. In reality, defendant was a nearly-40-year-old man making empty promises to dozens of girls in pursuit of his own sexual gratification.  Defendant lied to, groomed, and manipulated children to get what he wanted most from them:  sexually explicit images and sex acts with these children.

After a four-day trial, in which the government presented evidence consisting of over 60 exhibits and testimony from seven witnesses, including named victims A.T. and J.G., a jury convicted defendant of all six counts of the Second Superseding Indictment. This included two counts of sexual exploitation of a child to produce a sexually explicit visual depiction, one count of attempted enticement of a minor to engage in criminal sexual activity, one count of transporting a minor with intent to engage in criminal sexual activity, one count of distribution of child pornography, and one count of transportation of child pornography.

In the PSR, the Probation Office calculated a total offense level of 43, a Criminal History Category of I, and a Guidelines range of life imprisonment.  (PSR ¶ 209.)  The Probation Office

3

recommended a sentence of life imprisonment.  (Dkt. 227 at 2.)

Based on the facts of this case, the government recommends a sentence of life (to consist of 30 years on each of Counts 1 and 2, life on each of Counts 3 and 4, and 20 years on each of Counts 5 and 6, all such terms to be served concurrently); a lifetime period of supervised release in the event defendant is released from custody; $15,000 in restitution; and $600 in special assessments.

## II.    DEFENDANT'S EXPLOITATION OF CHILDREN WAS CALCULATED AND DESPICABLE

Defendant engaged in a methodical effort to sexually exploit children online through the social media platform Instagram. Investigators discovered half a dozen Instagram accounts with some variation of "dn" (defendant's initials), including the ones he used with victims A.T. and J.G.: "dn.2021.01," and "dn84831."[1]  (PSR ¶ 16.)  Defendant often created new accounts, most likely needing to drop old accounts when they were reported to Instagram for soliciting, sending, or receiving child sex abuse material.  To avoid losing information regarding potential victims, however, defendant would send Instagram handles of the girls with whom he had been communicating to his new accounts.  (E.g., Ex. A at 1992-1996.)

Defendant's interactions with minor girls on Instagram were textbook grooming.  When first meeting his victims online, defendant would try to gain their trust with flattery – telling them they were

---

[1] For the purposes of its sentencing position, the government includes a fraction of defendant's chat messages as exemplars.  For example, the account "dn.2021.01" spans approximately 20,100 pages when converted into PDF.  The account "dn84831" spans approximately 1456 pages when converted into PDF.

"beautiful" and "bomb." (Ex. A.) He would continue to "love bomb" them, complimenting them, learning about their interests (for A.T., dance and the Disney cartoon character Stitch), telling the girls he was a "great listener," informing them he would "give great advice," and letting them know that he "care[d] about" them. (E.g., Ex. B at 3.) Defendant vouched for himself, telling his victims he was "caring humble kind and loving," and carried himself with "sympathy empathy and understanding." (Id. at 4.) If the girls initially rejected him – which happened frequently – he would then resort to gaslighting and guilting them. For example, when A.T. initially rebuffed his advances (telling him that he was "starting to piss [her] off"), he switched tactics and reassured her he wasn't the bad guy: "relax," "I didn't hurt you," "I know you have pain in your heart," "And you whiplashed on me," "I'm still going t[]o be here," and "if you want to talk I'm still here." (Id. at 11-12.) Sensing A.T.'s insecurities, he reassured her repeatedly: "I'm not abandoning you," and "I'm not going to hurt you or betray you." (Id. at 12.)

Before long, defendant would ask probing questions about his victims' pasts to gain their trust, identify their insecurities, and learn their vulnerabilities. For example, on the same day he met A.T. online, he asked if anything "bad" had ever happened to her. To encourage A.T. to share, defendant told her that his friends had been "Beaten, abuse, betrayed, abandon, bullied, cyber bullied, assaulted. Also molested, sexually assaulted and raped." (PSR ¶¶ 23-24, 107; Ex. B at 28.) A.T., believing defendant's intentions were pure, shared that she had been "thro all of that" and "[t]hat's

why I'm the way I am." (Ex. B at 28-29.) A.T. shared the specific details about what happened to her (Ex. B at 29), which then led to the first audio call between defendant and victim A.T. Thereafter, defendant claimed A.T. "wanted someone to know deep down inside" and told her that she was "not like any other girl" and that she was "better." (Ex. B at 33-34.) Having lowered A.T.'s inhibitions, defendant seized on the opportunity and asked if he could "see a full body picture" of A.T. (Ex. B at 37.) Defendant asked the same litany of probing questions to J.G. and obtained the same types of deeply personal information from her. (PSR ¶ 58.) Sharing these incidents brought defendant closer to his victims and closer to getting what he wanted from them: child sex abuse material and sex acts.

Once defendant achieved "boyfriend-girlfriend" status with his victims, he would sprinkle in sexual innuendo to desensitize his minor victims to the idea of engaging in sexual activity with him. When A.T. asked defendant innocent questions like "wyd" ("what are you doing"), defendant frequently responded with some variation of "soon you lol." (E.g., Ex. B at 97, 104, 109, 112, 113.) Very quickly, defendant's sexualization of their relationship became even more explicit and persistent – barraging victim A.T. with sexually explicit requests, sexualized compliments ("pussy looks bomb" (id. at 157)),[2] and further instructions and demands to A.T. on what he liked and expected to see in child sexual abuse material. (Ex. B at 157; see also PSR ¶¶ 26-30).

---

[2] Defendant lavished J.G. with similar compliments, telling her "Your kitty looks good" and "[i]t's looks bomb." (Ex. C at 53.)

Defendant was also cunning enough to adjust his strategy depending on the victim.  As J.G. described at trial, defendant could also be coercive, demanding, and callous.  For example, he threatened to break up with her if she did not send him the sexually explicit photographs he had asked for – insisting that the photographs were about "trust" and "love."  (Ex. C at 30 ("Those pictures are about something much more important"); id. at 38 ("I know but just trust me believe in me and show me your trust love and sacrifice").)[3]  Like with A.T., he also guilted J.G., telling her that he was "done with [her] lies and excuses" and that he thought she had "change[d]."  (Ex. C at 46; id. at 47 ("No disrespect you broken every promise and always lied . . . Always got excuses").) Defendant often depicted himself as the victim, both to avoid accountability for his actions and to successfully guilt his victims into doing what he wanted.

Defendant also forced his victims to isolate themselves from their family and friends.  As the Court saw during trial, defendant forced J.G. to choose between him or her best friend, K.A. (Ex. C at 20 ("Again you tell [K.A.] anything or let her see our conversation and I'm done"); id. at 58 ("[I]t's time to choose the hoe or me" "I never wanted to do this but she's corrupting you"; id. at 59 ("Stop talking to her" "Even in person").)  He made similar efforts to turn A.T. against her mom and grandmother – he blamed them for "making sure we lose contact" and "Wow that's fucked up they're trying to

---

[3] Defendant also threatened to "tell everyone and post [J.G.'s photos] to the internet so her friends and family would find out." (Ex. D at 2; see Ex. C at 20 ("Where are the pictures"); id. at 32 ("Ok tomorrow is your last chance").)

choose your partner." (Ex. B at 200-201.) Defendant's tactic worked, as A.T. assured defendant that she would not let her family members come between them.

Tragically, defendant's relentlessness paid off: he convinced both named victims to send him sexually explicit photographs and videos. But defendant was not satisfied with online relationships and pressured his victims into engaging in real-world sex acts with him. With both girls, he talked about having "babies" with them and starting a life together in Mexico. Then, when J.G. was visiting California, defendant provided her with the address of a local school and told her to meet him there (PSR ¶ 63), to have her make good on her promise to "have a child with [him] and live in Mexico together." (PSR ¶ 57.) Luckily, J.G. ultimately decided not to meet up with him because she "didn't feel right" about the situation, which enraged defendant. (PSR ¶ 64.)

A.T. was not so lucky. As the Court saw during trial, defendant constantly brought up the topic of having a baby with A.T. One day, he decided he had been patient long enough and drove up from Mexico. A.T., surprised he was already on his way, was reluctant at first and told defendant she was going to stay with her family, specifically, her siblings. Knowing guilt-tripping had worked in the past, defendant proceeded to remind her of the "promises" she had made him: "You made me promises . . . Remember to leave with me . . . What about making our baby[?]" (Ex. B at 267, 272; PSR ¶¶ 34-35.)

Once in Mexico, defendant forced A.T. to make good on all these "promises." (PSR ¶ 37; Rec. Ltr. at 9; Ex. E.)

**III. GUIDELINES CALCULATION**

The government concurs with the Probation Officer's offense level and Criminal History calculations. (PSR ¶¶ 85-172).

The Court only needs to find the facts supporting any specific offense characteristic (even those resulting in a significant increase in defendant's Guidelines range) by a preponderance-of-the-evidence standard." United States v. Lucas, 101 F.4th 1158, 1162 (9th Cir. 2024).  It means that the Court "must be persuaded by the evidence that the claim is more probably true than not true."  Ninth Circuit Model Civil Jury Instruction 1.6 (Burden of Proof – Preponderance of the Evidence).

To the extent defendant contests any specific offense enhancements, the government reserves its right to file a supplemental sentencing position paper addressing any contested specific offense enhancements or adjustments.  Because the enhancement under U.S.S.G. § 3C1.1 requires specific findings, however, the government sets forth the applicable law and some proposed findings for the Court's consideration below.

**A.    Obstruction of Justice Enhancement Under U.S.S.G. § 3C1.1**

The Supreme Court has instructed that a defendant may receive a § 3C1.1 enhancement based upon perjury at trial, but district courts must be careful to avoid chilling the right to testify.  After all, "an accused may give inaccurate testimony due to confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94-95 (1993).  In light of those concerns, the Ninth Circuit has held that a district court must make "express findings on all three prongs necessary for perjury to amount to obstruction of justice" under

§ 3C1.1.  United States v. Castro-Ponce, 770 F.3d 819, 822 (9th Cir. 2014).  Implicit findings are not enough.

Therefore, as it relates to the obstruction of justice enhancement under § 3C1.1 based on defendant's perjurious testimony at trial, the government requests that the Court explicitly find that (1) defendant gave false testimony, (2) on a material matter, and (3) with willful intent.  On the record before this Court (including PSR ¶¶ 118-119), defendant provided willful false testimony concerning material matters in this case.  Among other things, defendant knowingly and willfully testified falsely on material matters, such as identifying Julie Le as the person who used his Instagram account to send sexualized messages to the named minor victims; claiming Julie Le had spliced together recordings of his voice to create the "audio messages" that had been sent via Instagram; his lack of intent to engage in unlawful sexual contact with A.T. when transporting her from San Luis Obispo to Mexico; and his statements that his phone (in which he transported child sex abuse material), was a "magic phone" that appeared, disappeared, and re-appeared throughout his journey to San Luis Obispo and down to Mexico.  All these material lies (and many others) easily satisfy the standard for perjured testimony and support application of the obstruction of justice enhancement.

**B.    Defendant's Guidelines Range is Life**

With the incorporation of the applicable enhancements and adjustments, the government agrees with the Probation Officer who concluded the total offense level is initially 54.  (PSR ¶ 164.)

10

However, because the Sentencing Table ends at 43, the Guidelines provide that "in those rare instances when the total offense level is calculated in excess of 43," the offense level will be treated as level 43.  (PSR ¶ 166.)  With a criminal history category of I, (PSR ¶ 172), with which the government concurs, the Guidelines range is life.

**IV.  A LIFE SENTENCE IS SUPPORTED BY THE 3553 FACTORS**

**A.    Defendant's Offenses Were Profoundly Serious**

Sexual exploitation is among the gravest harms a child can endure.  Defendant's exploitation was pervasive and prolific, targeting dozens of girls on Instagram.  Inducing even one child to produce and share sexual abuse material is an extremely dangerous offense that causes irreparable harm with which the victim must grapple for the rest of her life.  See United States v. Isaac, 987 F.3d 980, 995 (11th Cir. 2021) ("[T]he greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime.  That is especially relevant in cases involving the production of child pornography.") (cleaned up) (collecting cases).

1.    Defendant Targeted Vulnerable At-Risk Girls

Defendant's offenses were particularly despicable because he sought out at-risk girls who had been victims of trauma for sexual exploitation, thereby warranting the Guidelines sentence of life recommended by the government.  See generally United States v. Williams, 291 F.3d 1180, 1196 (9th Cir. 2002) (affirming vulnerable victim enhancement for victim who "was particularly vulnerable because of her mental condition, which followed from the facts that

11

she had been raped by her mother's boyfriend when she was seven") (cleaned up), overruled on other grounds by United States v. Gonzales, 506 F.3d 940 (9th Cir. 2007) (en banc).

First, defendant would make his would-be victims feel safe enough to share anything with him, using his patented pedophile script.  He would first set the stage by stressing honesty:  "Can I ask you something" and "Be honest and don't hold back."[4]  Then, he would ask directly "Did something bad ever happened to you."  Depending on the victim's response, he would either (1) tell them that his friends had been "Beaten, abuse,[5] betrayed, abandon, bullied, cyber bullied, assaulted" (an all-encompassing list of traumas) or (2) claim that he himself had been the victim of abuse.  Finally, after his victims shared, he would reassure them that nothing had changed:  his friendship and love were unconditional.

Knowing these tactics worked, defendant used the same tricks with the victims in this case to learn and exploit their past traumas and insecurities.  With A.T., he started out by copying and pasting his standard initial inquiries:  "Can I ask you something," "Be honest and don't hold back" and "Did something bad ever happened to you."  (Ex. B at 28.)  A.T., reluctant to answer him directly, instead asked what he meant by "bad," to which defendant responded with his list of traumas (with the same formatting and grammar

---

[4] Defendant used these phrases verbatim or near-verbatim with his victims.  (E.g., Ex. A at 1915, 2082-2083, 2140-2041, 2516-17, 2639-2640, 4319-4320.)

[5] Regarding these list of traumas, defendant made sure to send these phrases to himself so he could easily copy, paste, and send them to the next victim – with the same formatting and inconsistent use of past and present tense.  (Compare Ex. A at 1993 with Ex. A at 1915, 2517, 4320, and Ex. B at 28.)

issues): "They [his friends] been Beaten, abuse, betrayed, abandon, bullied, cyber bullied, assaulted." (Id.)  With this shared trauma bond, A.T. eventually shared with him the details of her past, her feelings about the traumas, and aside from defendant, that only her best friend and cousin knew, as in, "2 people I trust the most." (Id. at 28-29; 33.)  Knowing how difficult A.T.'s family life had been and how difficult it was to share these traumas, defendant would viciously wielded A.T.'s traumas as a sword – another aggravating fact.  (E.g., Ex. F ("But like always, you wanna concentrate on you. Boo hoo, you. I already know. You're the biggest victim. You've gone through worse. You know, people should understand you, should be patient for you, feel sorry for you, have sympathy for you.").

With J.G., defendant successfully used the same playbook.  He asked her if anything "bad" ever happened to her; J.G. disclosed her past traumas.  Defendant then claimed he, too, had suffered trauma in the past.  (PSR ¶ 58.)

The cruelty with which defendant targeted traumatized young girls and exploited their vulnerabilities warrants a life sentence.

        2.    <u>Defendant Used His Victims to Recruit Additional Girls</u>

Unsatisfied with the number of girls he could personally reach and target on Instagram, defendant compounded the seriousness of his crimes by enlisting his co-defendant (Julie Le) and his current victims to recruit future would-be victims.  (PSR ¶¶ 46-48.)  As the Court saw during trial, defendant would often ask A.T. and J.G. to send Instagram accounts of other girls they knew.  With J.G., he was

even more explicit, telling her to target new girls: "Become friends with new girls" "Also remember get the cutest girl from class her information in every class but make new friends." (Ex. C at 60; see also id. at 21 (sending photo of a girl and asking about girls named "Faith" and "Marilyn")). In their willingness to remain in defendant's good graces, these victims provided additional potential victims to defendant at his request.

After all, using his victims to recruit more would-be victims had worked well for defendant. For example, with J.G., he met her through her best friend, K.A. (Ex. G at 1.) Like his other victims, K.A. first met defendant when she was 14 years old and about to start 8th grade. (Id.) And like with his other victims, defendant used Instagram to target K.A. by telling her she was "cute" and claiming he was a 15-year-old football player. (Id.) Then, K.A. introduced defendant to J.G. and the three of them became friends. Eventually, however, defendant became wary of K.A and did not want K.A. and J.G. to remain friends. K.A. recounts that defendant said the two could remain friends only if K.A. abided by the following rules:[6] (1) "Have kids with him [defendant]," (2) "Be his girlfriend," (3) "Have sex with him," (4) "Live with him," and (5) "Send him nudes." (Id. at 2.) K.A. refused. In response, defendant issued an ultimatum to J.G.: choose him or K.A. – or "hoe" as he called her. (Ex. C at 20 ("Again you tell [K.A.] anything or let her see our conversation and I'm done"); id. at 58

---

[6] To force compliance, defendant imposed similar rules on J.G.: "Number one don't tell you what to do and to stop trying to control you," "Number two fuck your cousin," and "Number three to respect me and talk to me." (Ex. C at 13.)

("I'm sorry but it's time to choose the hoe or me" "I never wanted to do this but she's corrupting you"); id. at 59 ("Stop talking to her" "Even in person").)

Defendant's cruel method of exploitation – forcing victims to recruit other would-be victims as well as isolating them from their loved ones – supports imposition of a life sentence. See United States v. Russell, No. 21-5519, 2022 WL 203330, at *2 (6th Cir. Jan. 24, 2022) (affirming Guidelines sentence for child pornography offenses because "Russell's offense conduct was extremely serious . . . given his apparent willingness to recruit others to engage in making pornography, child pornography, and to the point of trying to arrange to have a sexual relationship with the 13-year-old child") (cleaned up).

### 3. Defendant Inflicted Permanent Damage on His Victims

The suffering that defendant perpetrated upon his victims and their family members further warrants a Guidelines sentence of life. See United States v. Rangel, 697 F.3d 795, 804-807 (9th Cir. 2012) (affirming above-Guidelines sentence based in part on "substantial emotional turmoil" defendant had caused to victims); United States v. Cazimero, 712 F. App'x 670, 671 (9th Cir. 2018) (affirming above-Guidelines sentence and rejecting argument that "the district court erred . . . by imposing an upward variance on the basis of unsworn victim impact statements"); United States v. Thurman, 494 F. App'x 828, 831 (9th Cir. 2012) (affirming 120-year sentence for production of child pornography based on "the extreme psychological injury that the victims suffered"); United States v. Hall, 965 F.3d 1281, 1299 (11th Cir. 2020) (maximum possible sentence for production of child

pornography substantively reasonable because "Hall caused serious and lasting harm to his victims").

Named victims A.T. and J.G. – who both testified at trial – continue to bear the very real scars of defendant's exploitation. For example, A.T. writes that defendant's exploitation caused her to be "very depressed," that she did not want to "come out of [her] room," and she hasn't been able to talk to her mom or stepmom about the case. (Ex. J at 1.) As a result of misplacing her trust in defendant, A.T. is "more cautious now with people," and based on defendant's exploitation, she feels angry, depressed, and anxiety; has lost sleep; and has had repeated memories of the crime. (Id. at 2.) Defendant's exploitation was so profound that when law enforcement first recovered A.T., she felt "angry [defendant] got locked up" and that she "had to come home." (Id.) Now, though, she worries not only for herself, but that defendant "will take another girl." (Id.)

A.T.'s family shares these fears and anxieties. M.T. (A.T.'s stepmother) writes about the emotional and financial impact defendant's crimes have had not only on A.T. but also on their entire family. Unfortunately, the A.T. "who came home was not the child who left" and A.T. "remains trapped in the trauma of what happened in Mexico." (Ex. K at 1.) A.T.'s stepmother also writes about the helplessness she personally felt when she realized A.T. had been taken: "[f]or 11 days, we lived in a state of constant agony. I spent every waking second haunted by questions no parent should ever have to ask: Is she alive? Is she calling for us? Is she lying in a ditch?" (Id.) A.T.'s stepmother calls on the Court

to hold defendant "fully accountable for the lives he has shattered" and to impose "the maximum sentence allowed by law." (Id. at 2.)

P.L. (A.T.'s grandmother[7] with whom A.T. was staying) also still carries guilt and trauma, especially because A.T. was at her house when defendant took A.T. She writes about the day she discovered A.T. was missing from her home: a "grandmother's worst nightmare," just one day before A.T.'s quinceañera – which has irrevocably changed their relationship. (Ex. L at 1.) A.T.'s grandmother writes that she has not seen A.T. "since the day she disappeared" and defendant "ripped a part of [her] heart out" and "destroyed the relationship and bond we once shared." (Id.)

Defendant caused J.G. similar emotional pain and suffering. J.G. recounts that she had believed she and defendant "were boyfriend and girlfriend." (Ex. D at 1.) She had "feelings for him and did not want to lose him because he made her feel good about herself." (Id.) But, now looking back on how defendant had exploited her, she is "disgusted by [defendant] and what he did to her." (Id.) Even after the trial, instead of feeling relief or pride, J.G. feels "ashamed." (Ex. M at 1.) She is angry because she doesn't feel she can "trust anyone again" and "because he made [her] feel and look stupid." (Id.) Defendant's crimes changed how she views herself and "how safe" she feels around others. (Id.)

---

[7] Defendant also callously lied to A.T.'s grandmother when she asked him if he knew anything about A.T.'s whereabouts. (PSR ¶ 17-18; Ex. Q at 1.) In a panic, A.T.'s grandmother had messaged defendant because he was A.T.'s "last contact" on her phone. (Ex. Q at 2.) Defendant proceeded to lie to A.T.'s grandmother, claiming "I don't know where she is" and "Why is everyone asking me about [A.T.]?" (Id. at 1-2.)

17

She implores the Court "to understand that what he did was not a mistake," and asks the Court to prevent defendant from "continu[ing] to ruin other kids' lives."  (Id.)

Separate and apart from A.T. and J.G., defendant also had a collection of child sex abuse material.  Those victims, under the pseudonyms "April," "Pia," and "Alex" have also submitted statements to the Court as well as documentation regarding their losses.  (Exs. N, O, and P.)  These victims suffer from the widespread possession and dissemination of their images.  Describing her emotional, mental, and physical trauma, April worries that "[t]he images of me as a child will outlive me" but that it is "impossible to cope with and accept the fact that I must live with the images of my abuse being available on the internet forever."  (Ex. N at 12.)  She says it is "practically impossible to feel 'better' knowing there is absolutely nothing I can do about the images of my abuse being put on the internet indefinitely" and "impossible to feel better knowing that there are always going to be sick and depraved people who will find them and use them for their own pleasure" – like defendant. (Id.)  Pia, whose images constitute "one of the top downloaded series of child sexual abuse material that is circulating," echoes these other victims' pains.  (Ex. O at 35.)  She writes of the trauma of knowing that her "privates are no longer private," as child predators – like defendant – "have saved and shared images and videos of my tiny body lying naked and contorted in provocative ways."  (Id.)  Finally, another victim, Alex, has had her images "disseminated globally" and the "continued circulation of these

images subjects Alex to relentless fear and humiliation." (Ex. P at 3.)

No one should endure what these victims have endured. Only a Guidelines sentence of life can reflect the severity of the impact of defendant's offenses on his victims.

**B.   Defendant Has No Respect for the Law**

While defendant has zero criminal history points, that does not mean defendant has lived a law-abiding life. Defendant's criminal history, his obstructionist behavior during trial, his disciplinary issues while incarcerated, and his post-trial conduct all demonstrate that defendant requires a Guidelines sentence to attempt to instill some sort of respect for the law.

First, defendant has been arrested and charged with battery on a spouse/cohabitant (PSR ¶¶ 176, 177) and resisting arrest (PSR ¶¶ 179, 180).[8] The reports relating to defendant's arrests for battery on a spouse/cohabitant demonstrate his proclivity for abusing women. According to one arrest report, the victim and defendant had been in a dating relationship, had children together, and were living together. (PSR ¶ 176.) Then the two got into an

---

[8] Defendant's arrests for resisting arrest and obstructing an officer also demonstrate his lack of respect for law enforcement: refusing to follow instructions, being "immediately aggressive toward officers," "la[ying] on the ground of the holding cell and attempted to make himself hyperventilate," and claiming that he was in pain and feigning medical conditions even though hospital staff ultimately concluded he was "normal." (PSR ¶¶ 179-180.)

Even defendant's father, who was with him during one of these incidents, described defendant as "continual drama" and corroborated that the officers had not used any force, and, instead, it was defendant who had been "insubordinate toward the officers." (PSR ¶ 180.)

argument and defendant "pushed her and tried to take her phone." (Id.) When the police arrived, defendant then turned his ire on them and painted himself as the victim – "screaming that the officer was hurting him and violating his rights" and "told the officer he would have the officer fired for arresting him." (Id.) After seeing defendant's outburst during the arrest, the victim refused to press charges against defendant. (Id.) Just two months later however, defendant, once again, "took cellphones" from the victim and refused to return them, necessitating law enforcement intervention once again. (PSR ¶ 177.) This time, the victim said defendant "had hit her" but defendant denied doing so and claimed, "she had attacked him several days earlier." (Id.)

Second, defendant's behavior while incarcerated provides another data point regarding his lack of respect for the law. Defendant's disciplinary history while awaiting trial and sentencing in this case show that escalating sanctions (loss of privileges for 30 days, then 90 days, then 180 days) have done nothing to instill any respect for the law. Despite these graduated measures, defendant has continued to incur infractions for refusing a work assignment, refusing to obey an order, interfering with staff, and possessing an unauthorized item – 14 infractions to date. (Ex. H.)

Third, defendant's willful false testimony concerning material matters in this case undermined the criminal trial process and further supports a life sentence. See Dunnigan, 507 U.S. at 97 ("It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less

deserving of leniency than a defendant who does not so defy the trial process."). Attempting to mislead the jury, defendant testified that his co-defendant was the one talking to J.G. and A.T. When trying to "explain away" his voice on audio messages sent to victim A.T., defendant then concocted a story that his co-defendant had somehow spliced together recordings of his voice that she had accumulated over the years (that somehow also had defendant's special nickname for victim A.T.). Defendant's flagrant disrespect for the law and the sanctity of his oath to tell the truth as a witness further support a life sentence in this case.

Fourth, following defendant's convictions and facing a potential life sentence, defendant was undeterred and, nevertheless, continued to lie and flout the law. In September 2025 – about a month and a half after his convictions in this case – defendant signed a declaration claiming[9] that an inmate confessed to defendant regarding (1) the murder of his cellmate, and (2) lying about it on the stand. (Ex. I at 2.) Defendant signed this declaration under the penalty of perjury, and allowed it to be submitted in a pending federal criminal murder case to attempt to overturn the jury's verdicts in that case (United States v. Lerma, et. al, 18-172-GW). (Ex. I.) In February 2026, Judge Wu held an evidentiary hearing

---

[9] Defendant further claimed that this murderer-liar inmate "complimented" defendant on his "legal knowledge" and invited defendant to serve as his "bodyguard," which would be, according to him, a "strong upgrade" to their existing organization. (Ex. I at 3.)

According to the PSR, however, defendant stands 5'7", weighs 190 pounds, hears "voices," and has a history of "panic attacks." (PSR ¶¶ 189, 191.)

21

during which defendant testified; as to defendant, Judge Wu concluded that defendant was not credible or believable.  (Ex. R at 11 ("Fourth and most importantly, the Court simply does not find the situation described by Navarro to be credible or believable."))  So now another trier of fact has concluded what the jury determined here:  defendant is a liar.

Only a Guidelines sentence can attempt to instill in defendant some respect for the law and deter him from future crimes.

**C.    Defendant's History and Characteristics Do Not Support a Below-Guidelines Sentence**

Despite this Court's urging after the jury found defendant guilty, defendant refused to be interviewed by Pre-Trial Services even after "multiple attempts."  (PSR ¶ 182.)  However, based on information from the record – defendant's numerous filings with the Court (including his pro se filings and requests for reconsideration of order of detention) – we know that defendant has "two sisters and three brothers."  (PSR ¶ 183.)  Four family members believed in and supported defendant, as they agreed to be sureties and to pledge $25,000 each.  (Dkts. 28 and 66.)  Defendant graduated from high school in 2003 and was employed by a Dollar Tree distribution, a Coremark distribution center, and according to him, held "volunteer roles at charity organizations."  (PSR ¶¶ 194, 196.)  From trial, the Court also knows that, most recently, defendant made a living by buying abandoned, delinquent storage units and then reselling the contents for profit.  Defendant also has a family – four children, ages approximately 8, 10, 16, and 18.  (PSR ¶ 185.)

Nothing in defendant's background warrants a variance from a Guidelines sentence of life.

### D. Deterrence and Protection of the Public Require a Life Sentence

A lifetime sentence is required to deter others generally from engaging in similar conduct, and to protect other young girls from defendant's unrelenting drive to sexually exploit them. See United States v. Shouse, 755 F.3d 1104, 1109 (9th Cir. 2014) (affirming consecutive sentence based on "the need to protect the public from further criminal behavior" by defendant) (cleaned up); Thurman, 494 F. App'x at 831 (affirming 120-year sentence where court considered "the need to protect the public" and "Congress's intent to deter the sexual exploitation of children through increasing penalties") (cleaned up); United States v. Herbst, 357 F. App'x 42, 44 (9th Cir. 2009) (affirming 70-year sentence for multiple counts of sexual exploitation of a minor because it "was necessary to protect the public").

Defendant's exploitation of the victims in this case, and his complete lack of remorse for what he has done, demonstrate that he will not stop targeting vulnerable young girls in pursuit of his own sexual gratification. The only way to protect the public from defendant is to put him in prison and keep him there for the rest of his life.

### E. A Lifetime Period of Supervised Release Should be Imposed

Given defendant's extensive abuse of numerous children, to protect the public from further crimes, to account for defendant's lack of respect for the law, and to provide defendant with any

23

needed educational, medical care, and/or correctional treatment, the government agrees with the Probation Officer that a lifetime term of supervised release is appropriate here.

### F. Restitution, Special Assessments, and Fine

While defendant refused to comply with the financial disclosure requirements in connection with the Presentence interview process (PSR ¶ 198), the government nevertheless agrees that defendant does not have the ability to pay a fine, or the special assessments pursuant to 18 U.S.C. § 3014(a)(3) and § 2259A(a).  A special assessment of $600 is still mandatory.  18 U.S.C. § 3013.  (PSR ¶ 219.)  And restitution is due regardless of defendant's ability to pay.  18 U.S.C. § 2259(b)(4) (restitution order is "mandatory" and a court "may not decline an order under this section because of . . . the economic circumstances of the defendant").  (See also PSR ¶ 224.)  The provisions of the Mandatory Victim Restitution Act of 1996 apply to this offense.  Further, the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 is applicable to some of the counts of conviction in this matter.

Under 18 U.S.C. § 2259(c)(3), the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000.  18 U.S.C. § 2259(b)(2).  Given the circumstances and the trauma suffered by each of the victims in this case as detailed in the attached exhibits (Exs. J, K, L, M, N, O, and P), and at trial, the government requests that the Court (1) find that each of the following individuals is a "victim" in this case (A.T., J.G.,

"April," "Pia," and "Alex") and (2) impose restitution in the amount of $3000 per victim ($15,000 total).

**V.    CONCLUSION**

Based on the facts of this case, the government recommends a sentence of life (to consist of 30 years on each of Counts 1 and 2, life on each of Counts 3 and 4, and 20 years on each of Counts 5 and 6, all such terms to be served concurrently); a lifetime period of supervised release; $15,000 in restitution; and $600 in special assessments.